### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

_____
                                          )
**SUZANNA SENSING,**                      )
                                          )
     **Plaintiff,**                      )
**v.**                                    )          **Civil Action No.: 06-11508-RCL**
                                          )
**OUTBACK STEAKHOUSE OF**                 )
**FLORIDA, INC. AND CHARLES**             )
**KOZMITS,**                              )
                                          )
     **Defendants.**                     )
_____)

### MEMORANDUM OF LAW IN SUPPORT OF
### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

     Defendants Outback Steakhouse of Florida and Charles Kozmits submit this

Memorandum of Law in Support of Defendants' Motion for Summary Judgment.   As

shown below, Outback reasonably requested that Ms. Sensing submit to an independent

medical examination to determine whether she could safely perform her duties as a

"Takeaway" waitress. By refusing to follow up on the examination request, Plaintiff

abandoned the 'interactive process' and her job.  Plaintiff cannot show that she is a

"handicapped" individual within the meaning of M.G.L. Chap. 151B; she denies that  her

medical conditions renders her unable to perform a class of jobs or a broad range of jobs

in various classes.  As to her breach of contract claim, Plaintiff cannot show either the

existence of an employment contract or its breach.  Lastly, Plaintiff's defamation claim

fails; Mr. Kozmits statement that Plaintiff was "ineligible for rehire," in response to a

pretext reference call, is not actionable. Thus, Plaintiff's claims should be dismissed in

their entirety.

## I. <u>SUMMARY OF UNDISPUTED FACTS.</u>

### A.    <u>Background</u>

Defendant Outback Steakhouse of Florida, Inc. operates a nationwide group of causal steakhouse restaurants, including an Outback restaurant located on Andover Road in Peabody, Massachusetts. At all relevant times herein, the Peabody Outback restaurant was managed by Defendant Charles Kozmits.[1]  Plaintiff Suzanne Sensing was hired by the Peabody Outback restaurant in 2000 as a hostess; she subsequently was assigned to a "Takeaway" position. ( D.St. at ¶¶1-3.)

As a Takeaway, Plaintiff was responsible for taking "to go" orders by telephone, preparing and packing utensils and condiments, packaging the customers' food orders, delivering the order from the kitchen area to the customers' cars waiting in the parking areas, and handling  payments. The Takeaways work in a fast-paced, demanding work environment highlighted by the need for speed and accuracy in the preparation and delivery of hot food orders within tight time targets.[2] The Takeaway position is physically demanding, requiring Takeaway personnel quickly pack and carry multiple heavy bags of hot foods and beverages to the parking lot in all weather, rain, ice or snow.[3]  (D.St. at ¶¶4-6.)

### B.    <u>Plaintiff is required to take a one month medical leave; Plaintiff is reinstated to light duty work.</u>

The Plaintiff was diagnosed with multiple sclerosis in 2003. She also was a

---

[1] D. St. references are to numbered paragraphs of Defendants' Local Rule 56.1 Statement of Material Facts and the supporting exhibits referenced therein.

[2] The takeaway business at the Peabody restaurant was very busy in 2004-2005. It accounted for 14-16% of the restaurant's business, making it one of the busiest takeaway operation in the country (D.St. at ¶6).

[3] Prevention of "slip and fall" injuries was a high priority at Outback. Non-skid mats were deployed in the kitchen area. Employees were required to wear shoes with non-skid soles. Spills were quickly wiped up. Nevertheless, the restaurant faced workplace injuries due to slip and falls, including a past knee injury to Plaintiff and a back injury to Ms. Wilforth. Restaurant employees carry hot food items, work  around stoves and ovens, and handle  glassware and knives. Takeaway employees also work in the parking lot in all weather.  The Company reasonably sought to minimize slip and fall accidents. ( D.St. at ¶7.)

diabetic.  In 2004, Plaintiff told Mr. Kozmits and the other staff at the Peabody restaurant about her medical conditions. (D.St. at ¶8.)

From October 25, 2004 to November 27, 2004 Plaintiff was on a medical leave of absence due to illness.  The restaurant staff took various actions to help Plaintiff and her family.  These actions included making and delivering meals to her family and cleaning their house. The restaurant staff collected $500, and used it to buy her children Christmas presents and a gift certificate for her and her husband. (D.St. at ¶¶9-10.)

On November 28, 2004, Plaintiff returned to work in a "light duty" position created for her. Plaintiff was assigned work that could be performed while seated, such as selling holiday gift certificates and answering telephones.  On some evenings, shifts were created for Plaintiff which would not have been filled but for Outback's desire to give her work.  Shortly after beginning this light duty position, Plaintiff reduced her normal number of shifts by one shift.[4]  (D.St. at ¶¶11-12.)

On December 18, 2004, Plaintiff left work early complaining that she could not feel her arms (D. St. at ¶13).

 In late December 2004, Plaintiff suffered a "flare up" of her condition during work, resulting in muscle spasms.  During this "flare up," she also lost control of her bladder while handling food in a work area (D.St at ¶13).

**C.      Plaintiff returns to the Takeaway job.**

On February 3, 2005 Plaintiff asked to resume her duties as Takeaway and produced a note from her doctor stating that she could resume her Takeaway duties as Takeaway "as tolerated." [5]  On February 16, 2005 Plaintiff resumed her Takeaway

---

[4] Upon return from her medial leave, Plaintiff told Erin Ray, the key employee responsible for scheduling and assigning employees, that she wanted to ease back into work, so Plaintiff dropped one of her four regular shifts (D.St. at ¶15).
[5] Plaintiff states that she did not start Takeaway assignments until mid-February 2005, and denies being assigned as a Takeaway on February 3, 2005.  Outback's computer schedule and payroll records show that Plaintiff was listed as an "on call server" from December 2004 until a Takeaway shift on February 3, 2005. The records show that Plaintiff

position.  (D.St. at ¶¶14-15, 17.)

In April 2005, Plaintiff's co-workers and managers were concerned about with Plaintiff's ability to work safely as a Takeaway.[6]  Mr. Kozmits, Ms. Ray[7], and co-workers Lisa Balboni and Vanessa Wilforth observed that Plaintiff was very slow in performing tasks.  Plaintiff's gait sometimes was unsteady, and Ms. Ray tried to have Plaintiff avoid the kitchen/preparation areas because her coordination would appear off.  Sometimes Plaintiff seemed to drag her leg.  Plaintiff had difficulty polishing and rolling silverware, scooping butter, or similar manual tasks.  She was not able to carry as many bags as other workers.  At times, Plaintiff's hand would appear to cramp up in spasm. At times, her complexion was very flush. At times, Plaintiff would tell her co-workers that she was in pain, or that her hands or leg were numb.  She cried at work often. (D.St. at ¶¶20-25.)

When Plaintiff worked Takeaway, co-workers pitched in to compensate for Plaintiff's limitations by performing tasks Plaintiff could not perform.  Ms. Wilforth admitted that it was extremely difficult working with Plaintiff as Takeaway because of the extra demands it placed on her. (D.St. at ¶¶24-25.)

**D.**    **Plaintiff is unable to finish her April 21, 2005 shift; Plaintiff complains of physical problems the following day and cancels her next scheduled shift on April 23, 2005.**

On Wednesday, April 21, 2005 Plaintiff became highly emotional at work, and was crying in the Takeaway room. When Ms. Ray asked what was wrong, Plaintiff told her that Plaintiff  had not been able to feel her legs for the past few weeks.  Ms. Ray said

---

resumed 'on call' duties after February 3 until she resumed Takeaway shifts on February 16, 2005.  The time records show her leaving work on February 3 at 8:06 p.m.  Her typical Takeaway departure time was between 10:30 p.m. and 11:30 p.m. (D. St. at ¶¶15-17.)

[6] According to Plaintiff, during February-April 2005 she experienced no physical symptoms of multiple sclerosis or diabetes that impaired her performance. Plaintiff states that she was able to fully perform her job in all respects.  This is fully consistent with her statements at the time to co-workers that she was "fine" and was able to continue doing Takeaway assignments.  (D.St. at ¶19.)

[7] Erin Ray was the "key 'employee at the Peabody restaurant.  As a key employee, Ms. Ray was responsible for setting wait staff and takeaway schedules, coordinating work in the "front of the house' where customers are served

that she should go home; Plaintiff replied that she couldn't, that she needed the money. Mr. Kozmits also went to the Plaintiff while she was crying on April 21 and asked if she was okay.  Ms. Ray arranged for another worker to cover the remainder of Plaintiff's shift, and Plaintiff went home. (D.St. at ¶¶26-27.)[8]

The next day, Friday, April 22, 2005, Plaintiff drove to the Peabody Outback with her children to pick up her tip money. She told Ms. Ray that her legs were numb, that she couldn't feel anything below her waist.  Ms. Ray observed that Plaintiff's hand appeared to be clenched in a muscle spasm.  Ms Ray told Plaintiff that she should not be driving, especially with kids in the car.  Plaintiff replied, "I know I shouldn't."  Plaintiff also spoke with co-worker Vanessa Wilforth on April 22, 2005, while at the restaurant. Plaintiff told Ms. Wilforth about the lack of feeling in her legs.  Ms. Wilforth also expressed strong concern about Plaintiff driving with her children in such condition. Both Ms. Ray and Ms. Wilforth reported their conversations and observations of Plaintiff's condition to  Mr. Kozmits. Ms. Wilforth told him that she could not continue to do her own work and Plaintiff's work as well because it was overwhelming her.  (D.St at ¶¶30-32.)

Plaintiff's next scheduled shift was on Saturday, April 23, 2005; Plaintiff called in sick. (D.St. at ¶33).

**E.      Outback requires Plaintiff to undergo an independent medical examination at Company expense  prior to reinstatement to a Takeaway position; Plaintiff declined Outback's offer of a interim light duty position pending the examination, refuses to follow up to schedule the medical exam and abandons her job.**

On Wednesday, April 27, 2005, Mr. Kozmits telephoned Plaintiff, and told her not to report to work because her shifts had been covered.  He allegedly told her that she

---

[8] According to Plaintiff, her physical symptoms on April 21 were tingling sensations in her face and legs.  Plaintiff states that she was fully able to complete her shift, but accepted an offer for her to leave early. In a medical record dated April 12, 2004, Plaintiff reported to her medical care provider that she was numb from the waist down. The medical record is Exhibit 7 of Plaintiff's deposition.  (D.St. at ¶¶28-29.)

should take her scheduled vacation in early May and, when she got back and had her medical issues under control, to call him. Plaintiff told him that she was fine. Mr. Kozmits allegedly said that he was not comfortable with Plaintiff coming to work that night due to the liability. (D.St. at ¶34.)

The next day, Thursday, April 28, 2005, Plaintiff met with Mr. Kozmits at the restaurant and told him that she was capable of working. Plaintiff gave him a doctor's note clearing her to work. Mr. Kozmits told Plaintiff that he had serious questions concerning whether she could continue to perform her Takeaway job. He allegedly told her that he couldn't have her falling in the restaurant, that she was a potential liability. Plaintiff claimed that she posed no more risk of liability than any other employee. Mr. Kozmits disagreed. Mr. Kozmits stated that he did not believe that Plaintiff's doctors "know what's going on." Mr. Kozmits indicated that he would have to contact his superior for guidance on how to handle the matter. (D.St. at ¶35.)

On Friday, April 29, 2005, Plaintiff left a telephone message with a co-worker for Mr. Kozmits to call her. He returned the call the next day. Plaintiff told him that she cancelled her planned vacation and wanted to return to work. Mr. Kozmits told her that he would have to call the corporate office in Tampa for instruction and that he would get back to her. (D.St. at ¶36.)

On Tuesday, May 3, 2005, Plaintiff telephoned the corporate office; Mr. Kozmits was not in. She left a verbal message with a co-worker asking him to call her. (D.St at ¶37.)[9]

On Thursday, May 5, 2005, Plaintiff spoke to Mr. Kozmits by telephone. Plaintiff stated that she really wanted to get back on the work schedule because she needed the

---

[9] Mr. Kozmits does not recall receiving this telephone message, and states that as a practice he returns all telephone messages he receives (D.St. at ¶37).

money.  Mr. Kozmits said that he had placed a second call to the corporate office and

would let her know as soon as he heard back from corporate. Later that day Plaintiff

faxed the following message to Mr. Kozmits:

> Dear Charles:  Thank you for the brief chat this morning.  As we
> discussed I really need an answer today regarding my takeaway shifts.
> I am planning on returning to my normal takeaway schedule on
> Wednesday 5/11 and would like to pick back up this Saturday 5/7
> unless I hear otherwise.  I need to work and cannot drag this on any
> longer., Thank You   Suzanna.

Shortly thereafter the same day  Mr. Kozmits called Plaintiff back. He told

Plaintiff that before she was reinstated to Takeaway, she would have to submit to an

independent medical examination, at the Company's expense, to determine whether she

safely could perform the Takeaway job. Mr. Kozmits told Plaintiff that he was looking

for a doctor in the area to perform the examination. Mr. Kozmits offered Plaintiff light

duty work while the independent medical examination was being set up. Plaintiff said

that she financially could afford to do light duty, and needed Takeaway.  Plaintiff recalls

that Mr. Kozmits was to call her back. (D.St. at ¶¶38-39.)

Plaintiff admits that she did not accept the interim light duty offer job based on

her belief that she would obtain more money by filing for unemployment compensation.

Plaintiff did not call Mr. Kozmits again to find out which physician would perform the

independent medical examination.  Instead, she decided based on her decision to turn the

matter over to her attorney. Plaintiff explained that she did not call back because she was

"sick of playing games."  After several days passed without communication from

Plaintiff, Mr. Kozmits concluded that Plaintiff had come to the realization that she was no

longer capable of performing the Takeaway position and had decided to abandon her job. (D.St.40-42.)[10]

Since the cessation of her part-time Outback employment Plaintiff has held two part-time  jobs; as a customer service representative at a Subway sandwich shop and as a customer service manager at an arts and crafts establishment called "Paint the Rainbow." She is content in her current job and has not sought alternative employment. (D.St. at ¶45).

**F.**   **Plaintiff arranges a pretext reference call to see what Outback would say about her.**

Following the cessation of her Outback employment, Plaintiff asked her mother to have someone from her mother's employer, Snyder Security, call Outback to see what reference Plaintiff would receive. At the time, Snyder Security had no job openings that Plaintiff was seeking to fill.  Plaintiff's mother later reported to Plaintiff that a co-worker, called Outback on a pretext reference check, and that during the call, Mr. Kozmits provided Plaintiff's dates of employment and stated that she was not eligible for rehire.[11] Under Outback personnel policies, individuals who abandon their jobs are not eligible for rehire. (D.St at ¶¶46-52.)[12]

**G.**   **Plaintiff's breach of contract claim.**

Ms. Sensing did not sign any written employment contract with Outback. Outback's policy manual expressly provides that employees are employed on an "at will"

---

[10] At the end of Plaintiff's employment, Ms. Ray, Ms. Wilforth and Ms. Balboni all questioned whether Plaintiff could perform the Takeaway job and shared those beliefs with Mr. Kozmits.  Dr. Peter Warriner, a neurologist who has  examined Plaintiff and reviewed medical records provided by the Plaintiff to him,  has stated, to a reasonable degree of medical certainty, that in April/May 2005 Plaintiff's multiple medical issues would have easily raised concerns about about her ability to walk and about her safety while performing other  physical tasks. (D.St.at ¶43-44).
[11] Plaintiff was neither on the phone or present in Ms. Batsinelas' office when the call was made.  Plaintiff learned about the call from her mother (D.St. at ¶48).
[12] The only other alleged act of defamation claimed by Plaintiff was a comment by Mr. Kozmits to her to the effect that he thought she was a "liability."  Plaintiff admits that the statement was made to her alone, and there were no other witnesses who overheard the comment.  (D.St at ¶53.)

basis, and that the Company's policies do not create employment contracts (D.St. at ¶54).

Outback distributed its anti-discrimination policies to Plaintiff during her employment

but she never referred to the policy in 2005. Plaintiff is unable to identify any

employment contract she had with Outback that was breached by Outback or Mr.

Kozmits. (D.St at ¶¶56-59.) [13]

## II.  STANDARD OF REVIEW.

Summary judgment is appropriate where, construing the record evidence in the

light most favorable to the nonmoving party, there is no genuine issue of material fact,

and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

See, e.g., Guzman-Rosario v. United Parcel Service, Inc., 397 F.3d 6, 9 (1st Cir. 2005).

A factual dispute which is neither "genuine" nor "material" will not survive a

motion for summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91

L. Ed. 2d 202, 106 S. Ct. 2505 (1986). In deciding whether a factual dispute is "genuine,"

the Court must determine whether the evidence is such that a reasonable jury could return

a verdict for the non-moving party. Id. See also National Amusements, Inc. v. Town of

Dedham, 43 F.3d 731, 735 (1st Cir. 1995). "Only disputes over the facts that might affect

the outcome of the suit under governing law will properly preclude the entry of summary

judgment." Anderson, 477 U.S. at 248; National Amusements, 43 F.3d at 735.

Rule 56 does not permit the party opposed to the summary judgment motion to

rest upon the mere allegations or denials in its own pleadings. Rather, as stated by the

Supreme Court:

---

[13] Plaintiff claims that she was unaware of Outback's policies on anti-discrimination, grievances and complaint handling or other employment topics.  She was not aware of any policy requiring prior notice of termination. When questioned about what employment contract Plaintiff believes that she had with Outback, Plaintiff  stated: "I work for them so many hours a week, they pay me so much an hour and I show up and do the job."(D.St at ¶59.)

> The plain language of *Rule 56(c)* mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).

Summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Rivera-Cotto v. Rivera, 38 F.3d 611, 613 (1st Cir. 1994) quoting, Medina-Munoz v. R.J. Reynolds Tobacco Company, 896 F.2d 5, 8 (1st Cir. 1990).

### III.  ARGUMENT

**A.    MR. KOZMITS REASONABLY REQUIRED PLAINTIFF TO SUBMIT TO AN INDEPENDENT EXAMINATION AS A CONDITION FOR REINSTATEMENT TO THE TAKEAWAY POSITION: PLAINTIFF'S FAILURE TO FOLLOW UP AND SCHEDULE SUCH AN EXAMINATION CONSTITUTES ABANDONMENT BOTH OF THE INTERACTIVE PROCESS AND HER JOB.**

### 1.    Applicable Principles

To state a case of handicap discrimination under M.G.L. Chap. 151B, Plaintiff must proceed under the well-established three-stage order of proof.  See, e.g., Labonte v. Hutchins & Wheeler, 424 Mass. 813, 821 (1997). To set forth an initial prima facie showing, Plaintiff must  prove that: (1) [she] was "handicapped" within the meaning of the M.G.L. Chap. 151B., (2) that she was able to perform her essential job functions with or without reasonable accommodation, and (3) that she was discharged because of her protected handicapped status. Russell v Cooley Dickinson Hosp., 437 Mass. 443, 449-50 ( 2002).[14]

A handicapped employee's request for an accommodation triggers an "interactive process" between the employee and employer to determine a reasonable accommodation.

---

[14] Bryant, supra; at 168-169.

Ocean Spray Cranberries, Inc. v. MCAD, 441 Mass. 632, 644 (2004). The employer's

obligation is only to afford a "reasonable accommodation," and not necessarily the

accommodation the employee requests or desires.  Bryant v. Caritas Norwood Hosp., 345

F. Supp. 2d 155, 169 (D.Mass. 2004).  To prevail on a claim under this theory, the

Plaintiff must show that the employer, despite knowing of her handicap, failed to offer a

reasonable accommodation. Carroll v. Xerox, 294 F.3d 231, 237-8 (1st Cir. 2002).  A

failure of the employee to participate in good faith in the interactive process, or the

employee's rejection of an offered reasonable accommodation, relieves the employer of

liability under the anti-discrimination laws.  Bryant, supra. at 168-169.

The ADA allows an employer to require an employee to undergo a medical

examination if the examination is job-related and consistent with business necessary.  See

29 C.F.R. Part 1630, App. to §1630.14(c).  See also Yin v State of California, 95 F.3d

804, 811 (9th Cir. 1996); Ditullio v. Village of Massena, 81 F.Supp. 2d 397, 411

(N.D.N.Y. 2000).  See also MCAD Guidelines: Employment Discrimination on the Basis

of Handicap; Chapter 151B, ("MCAD Guidelines"), at V (F) (Citing federal law for

proposition that employers may require medical exams concerning the ability of

employees to perform job-related functions or where there is evidence of performance or

safety problem).

**2.       Plaintiff cannot demonstrate that she was "handicapped" or "perceived to be
         handicapped" under M.G.L 151B.**

Not all physical or mental impairments constitute a "handicap" under the

statute.  City of New Bedford v. MCAD, 440 Mass. 450, 461-462 (2004).   M.G.L. Chap.

151B, §1(17) provides that a "handicap" is (a) an actual 'physical or mental impairment

which substantially limits one or more major life activities; (b) a "record of having such

impairment;" or (c) "being regarded as having such impairment. Id. at 462.  Subparts (b)

and (c) incorporate all of the requirements of subpart (a); every plaintiff must demonstrate that an actual impairment, record of impairment or being regarded as having such impairment that "substantially limits one or more major life activities." Id. at 463-464. See also Murphy v. United Parcel Serv, 527 U.S. 516, 512-522, 144 L. Ed. 2d 484, 119 S. Ct 2133 (1999).

M.G.L.Chap.151B, §1(20) defines working as one of the "major life activities covered by the statute. An impairment substantially limits a person's ability to work if it prevents or seriously restricts an individuals' ability to perform a class of jobs or a broad range of jobs in various classes. City of New Bedford, supra. at 464-465, citing MCAD Guidelines at IIA.6.[15] As the SJC has noted, the MCAD Guidelines are, in this respect identical to substantial federal precedent interpreting the ADA. See Murphy, supra.; Carroll, supra at, 239-241; Lessard v. Osram Sylvania, Inc., 175 F.3d 193, 197-199 (1st Cir. 1999).

The determination as to whether an employee is handicapped for purposes of M.G.L. Chap. 151B requires an individualized assessment. Ocean Spray Cranberries, supra. at 637. "A plaintiff claiming that [she] is 'regarded' as disabled cannot merely show that [her] employer perceived [her] as somehow disabled; rather, [she] must prove that the employer regarded [her] as disabled within the meaning of the ADA." Bailey v. Georgia-Pacific Corp., 306 F.3d 1162, 1169 (1st Cir. 2002). The "inability to perform a single, particular job" does not constitute the required substantial limitation. Lebron-Torres v. Whitehall Labs., 251 F.3d 236, 240 (1st Cir. 2001). See also Santiago Clemente v. Executive Airlines, Inc., 213 F.3d 25, 32 (1st Cir. 2000).

---

[15] See also Ocean Spray Cranberries, Inc v. MCAD, 441 Mass. 632 (2004); Dube v. Middlesex Corporation, 59 Mass App Ct 734, 737-738 (2003).

During her deposition Plaintiff claimed that she had no physical work limitations. Conversely, Outback merely questioned whether Plaintiff could safely perform the Takeaway job.

The Takeaway job was a fast-paced, physically demanding position requiring constant action under difficult time expectations. Mr. Kozmits' concern that Plaintiff might not be able to perform safely the Takeaway duties does not establish that Outback believed that Plaintiff was unable to perform "a class of jobs" or "a broad range of jobs in various classes." Carroll, supra. at 239-241; Whitney v. Greenberg, Rosenblatt, Kull & Bitsoli, P.C., 258 F.3d 30, 33 (1st Cir. 2001); Gelabert-Ladenheim v. American Airlines Inc., 252 F.3d 54, 60 (1st Cir. 2001). Outback was willing to assign her to "call ahead" work. Outback was willing to provide light duty work, and would have reinstated Plaintiff to Takeaway if she was cleared for duty by the medical examination. Plaintiff subsequently secured two different jobs following her resignation from Outback.  On this record, there are broad ranges of jobs the Plaintiff can perform.

The fact that Plaintiff was diagnosed with multiple sclerosis is insufficient to establish that she is disabled, or perceived to be disabled, under M.G.L. Chap. 151B because it is insufficient merely to submit evidence of a medical diagnosis of impairment. Rather, it is "'the extent of the limitation [caused by their impairment] in terms of [her] own experience" which is determinative.  City of New Bedford, supra. at 463.

Similarly, Outback's request that Plaintiff submit to an independent medical examination does not establish that Plaintiff was "handicapped' within the meaning of the statute.  As observed in Tice v. Centre Area Transp. Auth., 247 F.3d 506, 514-5 (3d Cir. 2001 (quoting 29 C.F.R. Sec 1630.14(c)):

> A request for such an appropriately–tailored examination only
> establishes that the employer harbors doubts (not certainties) with

Case 1:06-cv-11508-DPW    Document 14    Filed 11/01/2007    Page 14 of 20

respect to an employee's ability to perform a particular job. Doubts
also do not demonstrate that the employee was held in any particular
regard…and, as we have explained, inability to perform a particular
job is not a disability under the ADA.

See also, Carmack v. National Railroad Passn. Assoc., 486 F.Supp 2d 58, 89-90 (D.Mass.
2007).

In this case, Plaintiff's representation is that she has no physical limitations to her

ability to work is fatal to her M.G.L. Chap. 151B claim. As to the Defendants'

"perception of her disability," Plaintiff can only show that Outback had serious questions

about her ability to safely perform the physically demanding Takeaway position. Since

Plaintiff simply cannot sustain her burden of demonstrating that she was "handicapped"

or "perceived as handicapped" within the statutory meanings of those terms, [16] she fails

to state an actionable claim of handicap discrimination under M.G.L. Chap. 151B. See

City of New Bedford, supra.; Calef v The Gillette Company, 322 F.3d 75,86-7 (1st Cir

2003); Dube, supra.

### 3.     No constructive discharge can be shown.

The essence of Plaintiff's M.G.L. 151B claim is that she was constructively

discharged because Outback required an independent medical examination before re-

instating her to Takeaway position. However, Outback's request for an independent

medical examination was no so "outrageous" and "intolerable" that that a reasonable

person "would feel compelled to forsake [her] job rather than submit to this looming

indignity." Vega v. Kodak Caribbean Ltd., 3 F.3d 476, 480 (1st Cir. 1993).

In the prior six month period, Plaintiff had a one-month medical leave, worked

light duty for two months, lost bladder control during a seizure at work while handling

---

[16] Of course, the question of whether Plaintiff was disabled (or perceived to be disabled) under
M.G.L.151B simply begs the question Outback reasonably tried to determine seeking an independent
medical examination. Tice, supra. However, since Plaintiff cannot satisfy this threshold jurisdictional
showing, her M.G.L. 151B claim must be dismissed

14

food, and had received a host of accommodations to allow her to continue working.
Plaintiff was given her choice of shifts, a reduced schedule and allowed to leave work
early when not feeling well.  She was given a stool to use when she tired.  A "light duty"
job was created for her.  When she resumed Takeaway in February, her managers and co-
workers compensated for her on the job as she struggled in the hectic restaurant kitchen
environment.  She left work on April 21 early and called out sick on April 23.  She told
co-workers that she no feeling from the waist down. In these circumstances, Outback's
request for an independent medical examination, at its expense, with a further interim
offer of light duty work, was reasonable and prudent action that was job-related and
premised on business necessity.  These facts do not support any claim of constructive
discharge.

**4.      Plaintiff's abandonment of the interactive process bars her claim.**

"Cases involving reasonable accommodation turn heavily upon their facts and an
appraisal of the reasonableness of the parties' behavior." Jacques v. Clean-Up Group,
Inc., 96 F.3d 506, 515 (1st Cir. 1996); Feliberty, M.D. v. Kemper Corp., 98 F.3d 274, 280
(7th Cir. 1996).  The "determination of a reasonable accommodation is a cooperative
process in which both the employer and the employee must make reasonable efforts and
exercise good faith...." Feliberty, supra. at 280.

Outback's request for an independent medical examination at its own expense
was reasonable and prudent continuation of an ongoing "interactive process' commenced
in 2004 to help Plaintiff continue her employment. By intentionally walking away from
the interactive process in favor of filing for unemployment, Plaintiff abandoned the
interactive process required both of employers and employees when reasonable
accommodations of medical conditions are sought.

Both parties, not just the employer, are required to engage in the reasonable accommodation process and to act in good faith. Outback's conduct during the last year of Plaintiff's employment demonstrates its good faith commitment and dedication to an interactive process designed to best accommodate Plaintiff's physical condition. Outback more than satisfied its responsibility to engage in a interactive process with the Plaintiff. In fact, Outback offered accommodation after accommodation to allow Plaintiff to continue working.

In this case, it was Plaintiff who abandoned the interactive process when she did not get what she wanted when she wanted it. After leaving a verbal telephone message with a co-worker for Mr. Kozmits to call her, Plaintiff ceased all efforts to arrange the independent medical examination. Plaintiff' intentional avoidance of the independent medical examination occurred while she was represented by counsel. Plaintiff rejected the offer of an interim "light duty" because she preferred instead to file for unemployment compensation. Plaintiff's abandonment of the process was an informed, intentional act. Plaintiff fully demonstrated her ability to communicate with Mr. Kozmits when she so desired. Her failure to do so after May 5 constituted an impatient, intentional abandonment of the interactive process, thus invalidating her current claim.

In Rennie v. United Parcel Service, 139 F. Supp. 2d 159 (D. Mass. 2001), a deaf plaintiff requested an interpreter during her orientation. The employer tried numerous times to schedule an interpreter, but for reasons attributable to both parties an interpreter could not be lined up for several weeks. About a week before the interpreter was scheduled to attend, the employee resigned because "she was no longer interested in working at UPS, claiming that the Company was playing a 'mouse and cat' game." Id. at 163.

As Chief Magistrate Collings observed:

16

> "In sum, no reasonable jury could find that the interactive process, either as to obtaining a qualified interpreter for the three days of training, including the hands-on portion or providing Rennie with a fourth day of training, had reached an end result when Rennie quit. The act of quitting  was, in essence, a complete failure to continue to engage in the interactive process and prevented UPS from making any further attempts to reasonably accommodate her. The end result is that Rennie cannot prove that UPS failed to reasonably accommodate her."  Id. at 172-73

 See Loulseged v. Akzo Nobel Inc., 178 F.3d 731, 734-35 (5th Cir. 1999) (employee responsible for the breakdown in the interactive process); Stewart v. Happy Herman's Cheshire Bridge , Inc., 117 F.3d 1278, 1287 (11th Cir. 1997)(employee's actions cause a breakdown in the interactive process.)

The law requires only that Outback provide a reasonable accommodation-- it does not vest Plaintiff with the right to demand an accommodation of her choice. See Bryant, supra. at 168-69.   Outback's offer of reinstatement conditioned upon Plaintiff's ability to pass an independent medical examination (coupled with Outback's offer of light duty work during the IME process) was a reasonable accommodation and thus Outback's obligation was fully satisfied.

**B.    PLAINTIFF CANNOT DEMONSTRATE THAT OUTBACK BREACHED ANY EMPLOYMENT CONTRACT.**

Plaintiff is unable to identify any employment contract with Outback, much less explain how Outback's actions breached such a contract.  Plaintiff  was an "at-will" employee.  She never reviewed the Company's anti-discrimination or other policies in 2005.  Had she or her counsel done so, she would have discovered an express "at-will" employment policy that is fatal to this claim.  (D.St. at ¶54.)  She is unable to identify any contract provision that had been breached by Outback.  As such, her breach of contract claim fails.  See, e.g., Carroll, supra. at 242; Jackson v. Action for Boston Community Development, 403 Mass 8, 15-16 (1988); Bergeson v. Franchi, 783 F. Supp. 713, 717-18

(D. Mass. 1992) (holding that "at-will" employee's breach of contract claim fails because,

an "at-will" relationship is by definition terminable at any time for any reason.)

## C.  PLAINTIFF CANNOT SHOW THAT SHE WAS DEFAMED BY MR. KOZMITS.

To prevail on a claim of defamation under Massachusetts law, the Plaintiff must

show (1) a false and defamatory communication (2) of any concerning her (3) which was

published or shown to a third party.  Miller v. Tope, 2003 U.S. Dist. LEXIS 2122

(D.Mass. 2003).  A conditional privilege applies when an employer makes an allegedly

defamatory statement in providing an employment recommendation.  Id. at 35-36.  See

also, Conway v. Smerling, 37 Mass. App. Ct. 1, 635 N.E. 2d 268, 273 (Mass. App. Ct.

1994).  Courts generally favor the use of summary judgment in defamation cases.  See

Mulgrew v. City of Taunton, 410 Mass. 631, 632 (1991).

As a preliminary matter, Plaintiff's defamation claim fails because the allegedly

defamatory statement by Mr. Kozmits – that Plaintiff was ineligible for re-hire – was

true.  Under Outback policies, employees who abandon their jobs were not eligible for re-

hire.  See, e.g., Yohe v. Nugent, 321 F. 3d 35, 39 (1st Cir. 2003) (Massachusetts law

requires Plaintiff establish that the alleged defamatory statement was false).  The

statement also was conditionally privileged and Plaintiff has shown no facts that would

warrant setting aside the privilege.  Thus, the statement was not actionable.

Moreover, even  assuming, arguendo, that the comment somehow was

slanderous,[17] Plaintiff's defamation claim still fails because the statement was made as

the  result of Plaintiff's ruse, and was not made to a bona fide prospective employer,  The

pretext reference call was requested by Plaintiff to see what type of reference she would

---

[17] There could be multiple reasons why one could be ineligible for re-hire, not all of which are necessarily negative.  It thus is difficult to conceive how the offending statement holds the Plaintiff, as required by Massachusetts law, "up to contempt, hatred, scorn, or ridicule" or "tends to impair [her] standing in the community . . . " Yohe, 321 F. 3d at 39, citing Tartaglia v. Townsend, 19 Mass. App. Ct. 693, 696 (1985).

get.  It was not part of a genuine job search; Snyder Security had no open  positions that Plaintiff was seeking. Rather, Plaintiff had her mother get a friend at work  to make a phony reference  call to Outback.  Thus, her mother's friend acted as Plaintiff's agent, and therefore there was no publication to a third party.

In Burns v. Barry, 353 Mass. 115 (1967), the plaintiff had been denied registration by the Board of Registration of Professional Engineers and Land Surveyors (the "Board").  The plaintiff then had difficulty securing employment, and he suspected that prospective employers were making inquiries with the Board.  He had his friend call the Board and pose as a prospective employer, during which time the allegedly defamatory statements were made.  The SJC upheld the dismissal of the defamation claim:

> Additionally, the opening tended to demonstrate that the allegedly slanderous matter of which the plaintiff complains was voiced to an individual employed by the plaintiff to elicit it. If there was a wrong here it was one invited and procured by the plaintiff himself and it would constitute great inequity to allow him to recover on the basis of it.

Id. at 118.  Likewise, in Dellorusso v. Monteiro, 47 Mass. App. 475 (1999) the plaintiff requested that the State Department of Personnel Administration ("DPA") inquire on her behalf with the Boston School Department to determine why she had not been offered employment.  As the Appeals Court observed:

> by pressing the DPA to learn the school department's reasons for not hiring her, [she] had consented to publication of material that might be defamatory and was foreclosed from maintaining a libel action, so long as the defendants in good faith thought the statements about [plaintiff] were true.

Id. at 475.  "The idea is that if a person elicits a statement, that person cannot build a legal action on what she has caused to be said or written."  Id. at. 478.[18]

Lastly, Plaintiff has not suffered any damages as the result of the alleged statement.  Id. ("plaintiff must show that [s]he has suffered special damages and must set forth these damages specifically").  Thus, the defamation claim fails.[19]

## IV.   CONCLUSION

For the foregoing reasons, Defendants Outback Steakhouse of Florida, Inc. and Charles  Kozmits respectfully request that their Motion for Summary Judgment be granted and that Plaintiff's claims be dismissed in their entirety.

Respectfully submitted,

OUTBACK STEAKHOUSE OF
FLORIDA, INC. and CHARLES
KOZMITS,

By Their Attorneys,


/s/ John F. Welsh_____
John F. Welsh, BBO #522640
Bello Black & Welsh LLP
One Exeter Plaza
699 Boylston Street, 10th Floor
Boston, Massachusetts 02116
(617) 247-4100

Dated: November 1, 2007


03018381

---

[18] The Appeals Court further held that the fact it was the DPA, rather than she, who contacted the School Board was of no moment, for it "was [plaintiff] who started the chain of inquiry by requesting the DPA to find out why she had not been hired."  Id.

[19]  The only other statement Plaintiff claimed to be defamatory was a statement to her by Mr. Kozmits, that was not witnessed or otherwise overheard by any other person, that she was a liability.  Because this statement was not published to any third party