UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SUZANNA SENSING, ) Plaintiff, ) v. ) Civil Action No. 06-11508-RCL OUTBACK STEAKHOUSE OF ) FLORIDA, INC. AND CHARLES ) KOZMITS, ) Defendants. ) | |

PLAINTIFF SUZANNA SENSING'S MEMORANDUM OF REASONS IN SUPPORT OF HER OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

NOW COMES YOUR PLAINTIFF, Suzanna Sensing, and, pursuant to Local Rule 9A(b)(1)(5), offers the below Memorandum in support of her OPPOSITION to defendants' Motion for Summary Judgment in this matter:

I. INTRODUCTION

Suzanna Sensing, a long-term and effective employee of defendants' in their take-out and eat-in restaurant in Peabody, Massachusetts, filed this action after she was told she would not be afforded the opportunity to resume her employment with defendant upon recuperation from an episode of her multiple sclerosis. Defendants have moved to dismiss her complaint under F.R.Civ.P. 56. But copious facts support her claims; and accordingly Ms. Sensing hereby opposes that motion.

II. <u>FACTS</u>

Suzanna Sensing, a wife and mother of two boys, has always worked to support herself and those depending on her. Ex. I. On or about March 9, 2000, she began a new job as a hostess for defendants' restaurant; and shortly thereafter was promoted to "takeaway," a member of the group which took takeout orders by telephone, filled them, and delivered them to waiting drive-in customers. Ex. B ¶¶3-4. During her employment with defendants, Ms. Sensing always performed her job in an exemplary, professional manner: she received the "Employee of the Month" award twice. Ex. B ¶5.

Unfortunately, Ms. Sensing was diagnosed with the remitting-relapsing form of Multiple Sclerosis ("MS") in late 2003, Ex. O, of which she informed her supervisors within a few months of her diagnosis. Ex. A p. 24 ll. 15-24; Ex. B ¶8. She had previously been found to have Type II Diabetes and was undergoing treatment. Ex. B ¶9; Ex. J ¶4. Multiple Sclerosis is an episodic, degenerative neurologic disease first identified in or about 1868. When the disease is in an aggravated state (referred to as a "flare-up") it causes numbness and can significantly impair a range of bodily functions, including walking, grasping, balancing, sensation and other muscular control functions. It also causes greatly increased fatigue and sometimes emotional lability. Ex. B ¶¶ 8-11; Ex. J ¶¶ 4-12.

In November, 2004, Ms. Sensing experienced her first major MS flare-up. The episode debilitated her almost totally: she had difficulty turning over in bed; needed help feeding herself and other self care; and in moving around, see Ex. B. ¶10; Ex. I ¶7. For the first time she experienced muscular weakness and a significant impairment of her ability to walk; and she was out of work on medical leave for approximately four weeks. Ex. A pp. 26, ll. 18-24; 27; 28, ll. 1-

19. Ex. B ¶10.  She was better by the end of the month and although she was still recovering, returned to work in the beginning of December, 2004, on light duty.  Ex. B ¶¶ 13-17; Ex. D.  Her recovery progressed sufficiently by mid-February 2005, that she returned to her full regular work duties and shifts, and worked regularly (with one or two sick days) through late April. Id.; Ex. B ¶¶15-17; Ex. I ¶9-11; Ex. L.  As before her absence, she worked hard and efficiently, indeed more than some others in the takeaway unit. see Ex. H, ¶¶16-17.

During her shift on April 21, 2005, Ms. Sensing was not feeling well and, after making arrangements to have her duties covered by another employee, went home early.  Before she left, however, she told her manager, Erin Ray (who had authorized her early departure), that she would be in for her next scheduled shift on April 23, 2005. Ex. A p 49.  Her illness persisted, however, and although she was prepared to work, she accepted her manager's suggestion that because another worker could take her shift, she take that shift off as well. Id. P. 51 ll. 4-23.

Several days later, April 27, 2005, just before Ms. Sensing's next regularly scheduled work shift, defendant Kozmits telephoned Ms. Sensing to tell her not to appear for work.  She was surprised and distressed by this call and protested that she was fine and ready to work.  She was distressed enough at this prospect of the lost employment (and income) to become tearful. Id. P. 56 ll. 4-15; Ex. K p. 121 ll. 3-5.

Faced with defendant Kozmits' continued unwillingness, Ms. Sensing called her direct manager, Ms. Ray to repeat her readiness, ability and willingness to work; and to seek the restaurant's facsimile number so she could provide further medical documentation of her capacity and eligibility to work.  Ex. A p. 57 ll. 11-20.  She also paid an unscheduled visit to her physician, who, after examining her, provided an additional note clearing her for work. Ex. A p.

60, ll. 14-23; Ex. E.

The next day Ms. Sensing paid an in-person visit to Mr. Kozmits at the restaurant, telling him again of her eligibility, ability and desire to work; and presenting him the new doctor's note, Ex. E. This time defendant Kozmits was quite explicit that he was not willing to restore her to employment because he saw her condition as exposing the restaurant to a danger of her falling which could cost the restaurant "$200,000 to $300,000." Ex. A pp. 58 ll. 14-24; 59, ll. 1-21; 126, ll. 4-23; Ex. C pp. 4-6. At the same time, despite their familiarity with Ms. Sensing and her job duties, Ex. B ¶¶ 28,29; Ex. J, he questioned the competence of her neurologist physicians to evaluate her capacity for work.

Despite this continuing adamance, Ms. Sensing did not give up. In another conversation on her cellular telephone, this one on April 30, 2005, Ms. Sensing told defendant Kozmits she was not going on her vacation because of the uncertainties of her employment, Ex. A p. 62 ll. 11-18; and that she desired and intended to return to work. In response, the individual defendant told Ms. Sensing he would call her when he heard back from his corporate superiors in Florida, whom he had contacted concerning her status (a promise he never kept.) Ex. K pp. 123-24.

Still Ms. Sensing did not give up. On May 3, and again on May 5, 2005, (her sixth and seventh attempts to return to her job), she telephoned individual defendant Kozmits to repeat her pleas and restate her commitment, Ex. A. P 65 ll. 7-22. She was examined by her multiple sclerosis specialist and was given a new note, Ex. F, which she also provided to defendant Kozmits.

Finally, as her eighth effort, after the individual defendant failed to honor his commitment to Ms. Sensing that he would be in touch with her after he had consulted his corporate superiors

in Florida, see Ex A p. 59, ll. 7-9; p. 64 ll. 17-23, Ex. K, pp. 123-24, she sent him an electronic mail message reiterating her preparedness and capacity to work; and specifying when she intended to return to work. Ex. G.

Mr. Kozmits responded in essence that despite her having worked more than two months successfully, Ex. A, p 43 ll. 12-24; Ex. B ¶¶ 15-19, Ex. I, he did not believe she could do her job and offered to let her return in a lower paid position or not at all.  His actions were contrary to the policies of Outback, see Ex. M, pp. 4-5.  And despite the persistence and tenacity Ms. Sensing showed regarding resuming her employment (notwithstanding his own failure to provide the name of an approved independent medical examiner to perform the examination he had required), he told a potential new employer of Ms. Sensing that she was ineligible for rehire by the defendants, relying on his groundless claim that she had abandoned her job. Ex. K p. 145 ll. 3-22; Ex. N; Ex. B ¶¶ 39-44.

Thereafter Ms. Sensing reluctantly filed her timely complaint with the Massachusetts Commission against Discrimination, which she subsequently removed to Superior Court pursuant to G.L. c. 151B §9.  Defendants now seek dismissal of that complaint on summary judgment; and because of the many facts supporting the complaint, Ms. Sensing hereby opposes that dismissal.

### III.  ARGUMENT

A.  THE LEGAL STANDARD GOVERNING SUMMARY JUDGMENT WILL NOT PERMIT THE GRANTING OF SUMMARY JUDGMENT AGAINST MS. SENSING ON HIS CLAIMS PRESENTED HERE

   1. The extraordinary remedy of summary judgment is to be applied only where there is

<u>not the slightest question of material fact in issue</u>.

Summary judgment is to be granted only where no material facts are in dispute and the moving party is entitled to judgment as a matter of law. Mass. R. Civ. P. 56(c); *Cassesso v. Commissioner of Correction*, 390 Mass. 419, 422 (1983); *Community National Bank v. Dawes*, 369 Mass. 553 (1976).  Moreover, the moving party bears the burden of affirmatively demonstrating these circumstances, *see, e.g.*, *Pederson v. Time, Inc.*, 404 Mass. 14, 16-17 (1989); *Cassesso, supra*, at 422; Mass. R. Civ. P. 56©.  To succeed, the moving party must demonstrate that the non-moving party is unable to produce evidence sufficient to raise a genuine issue as to any material fact.

The United States Supreme Court also recently reconfirmed that the trial court must "draw all reasonable inferences in favor of the non-moving party" (here Ms. Sensing); and that the court on [summary judgment] "...may not make credibility determinations or weigh the evidence," *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000)(Overturning judgment as matter of law because Fifth Circuit Court of Appeals disregarded evidence tending to undermine defendant's asserted non-discriminatory reason for its adverse action and failed to draw all inferences for non-movant plaintiff.)  This decision appears to be consistent with Massachusetts decisions, *see, e.g. Blare, Wheelock College*, *supra.*

2. <u>Summary judgment has particularly been condemned with relation to complaints of disability discrimination</u>.

The whole purpose of disability protection statutes is to enable people with disabilities to continue working and being self supporting, see generally 42 U.S.C. §12101(a)(8) and (9) (Nation's goals to include affording opportunity and chance of independent living to persons

with disabilities; dependency and non-productivity of disabled costs United States billions of dollars). It should be apparent that Ms. Sensing's efforts to remain employed, just as the statute contemplated she should do, and the defendants' denial, is precisely the situation the statute seeks to redress.

Decision on affidavits is also especially inappropriate in disability cases. Such cases are fact-intense, particularly as here where such questions as the essential functions of a position and the capabilities of a disabled employee remain open; and are thus not appropriate for summary judgment. The question of reasonable accommodation has been held to be quintessentially factual and thus not appropriate for summary judgment. The court is obligated to scrutinize the evidence before determining whether the defendant's justifications reflect a well-informed judgment grounded in a careful and open-minded weighing of the risks and alternatives, or whether they are simply conclusory statements that are being used to justify reflexive reactions grounded in ignorance. *See, e.g., Arline v. Nassau County School Board*, 772 F.2d 759 (11th Cir. 1985)(citations omitted). The Massachusetts court has held similarly, see, generally, *Dartt v. Browning-Ferris Indus., Inc.,* 427 Mass. 1(1998).

3.  <u>Summary judgment is improper where the complaint alleges disparate treatment</u>.

Summary judgment is a disfavored remedy in the context of discrimination cases based on disparate treatment, because the ultimate issue of discriminatory intent is a factual question, *see*, *Brunner v. Stone & Webster Eng'g Corp.*, 413 Mass. 698, 705 (1992) ("Where motive, intent, or other state of mind questions are at issue, summary judgment is often inappropriate"),

quoting *Flesner* v. *Technical Communication Corp.*, 410 Mass. 805, 809 (1991)[2]; *Anderson* v. *Bessemer City*, 470 U.S. 546, 572-573 (1985) (issue of intent in federal discrimination cases is a question of fact).  The ultimate question of the defendant's state of mind is elusive and is rarely established by means other than circumstantial evidence, which requires a jury to weigh the credibility of conflicting explanations of the adverse hiring decision, *see*, *Blare v. Husky Injection Molding Company*, 419 Mass. 437, 440 (1995); *Wheelock College v. Massachusetts Comm'n Against Discrimination*, 371 Mass. 130, 137 (1976).  These considerations are significant because in deciding a motion for summary judgment the court must draw all possible inferences in favor of the non-moving party, *see, e.g. Blare*, *supra*, at 438, citing *Wheatley* v. *American Tel & Tel. Co.*, 418 Mass. 394, 396 (1994).  In cases where motive, intent, or other state of mind questions are at issue,"[m]uch depends on the credibility of the witnesses testifying as to their own states of mind.  In these circumstances, the jury should be given an opportunity to observe the demeanor, during direct and cross-examination, of the witnesses whose states of mind are at issue." *Croley v. Matson Navigation Co.*, 434 F.2d 73, 77 (5th Cir.1971), *see*, *e.g.*, *Pederson*, *supra*, at 17.

B.  MS. SENSING SHOWS BY MATERIALS SUBMITTED HEREWITH THAT SHE IS ABLE TO COME FORWARD WITH ADMISSIBLE EVIDENCE WHICH, IF CREDITED, WOULD SUFFICE TO SUSTAIN A JURY FINDING THAT SHE WAS A HANDICAPPED PERSON ELIGIBLE FOR STATUTORY PROTECTION AND THAT

---

[2] Although before this court on diversity of citizenship grounds, this matter is brought under Massachusetts handicap discrimination law, which varies in substantial way from federal decisions, *compare, Dahill v. Police Department of Boston,* 434 Mass. 233 (2001) *with, Sutton v. United Air Lines, Inc.,* 527 U.S. 471 (1999).

<u>SHE WAS FIRED FOR THIS REASON; SO SUMMARY JUDGMENT MAY NOT ENTER HERE.</u>

1. <u>Ms. Sensing has demonstrated her ability to present evidence sufficing to sustain a jury verdict that she was entitled to the protections of the Massachusetts handicap discrimination law and was denied them; therefore summary judgment may not enter.</u>

Ms. Sensing's eligibility for handicapped protections is abundantly evident from the accompanying materials. And to the extent they show differing factual assertions between the parties, these materials also demonstrate genuine, material factual issues preclusive of summary judgment.

First, by the affidavit of her neurologist and medical records Ms. Sensing shows that she has Multiple Sclerosis, which, more importantly, substantially impairs the major life activities of walking, grasping, and working (on account of the fatigue it causes) among others. See Ex. I, O.

During her first (and so far only) strong flare-up, she was so badly impacted physically by her MS condition[3] that she could barely roll over in bed and needed help with self feeding and other self care. Ex. B ¶¶10-14. While in flare-up, her immobilized condition also substantially impaired her working, Ex. B ¶10; Ex. I ¶7.

Ms. Sensing's condition limited her in "major life activities" under the law. See, e.g., *Toyota Motor Mfg, Ky, Inc. v. Williams*, 534 U.S. 184, 197(2002). As the First Circuit notes, the Equal Employment Opportunity Commission ("EEOC"), whose regulations provide guidance in

---

[3] Legal analysis of Ms. Sensing's handicap discrimination claim turns on how her condition affects her functioning; however Ms. Sensing also notes that her having been diagnosed with multiple sclerosis is amply supported by evidence in the record, Ex. J; Ex. B ¶¶7-9; Ex. O.

applying the ADA, defines "'substantially limits' as '(I) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner, or duration under which the average person in the general population can perform the same major life activity." *Wright v. CompUSA, Inc.*, 352 F.3d 472, 476 (1st Cir. 2003) (quoting 29 C.F.R. § 1630.2(j)(1)). Factors to be considered in making this determination "are '(I) the nature and severity of the impairment, (ii) the duration or expected duration of the impairment, and (iii) the permanent or long term impact . . . of or resulting from the impairment.'" Id. (quoting 29 C.F.R. § 1630.2(j)(2)). Ms. Sensing's MS is incurable, Ex. J, and in flare-up is severe; also flare-ups can last weeks to months, id.

Second, Ms. Sensing's neurologist attests that she is capable of performing the essential functions of her takeaway job with or without accommodation. Dr. Kelliher wrote twice in the first half of 2005 that Ms. Sensing was capable of doing her job based on his examinations of her and his familiarity with her duties, Ex. I, D, E. Also, Ms. Sensing's multiple sclerosis specialist, Dr. Guy Buckle, director of the Partners Multiple Sclerosis Center, determined on May 5, 2005, that she was capable of resuming her employment without restrictions, see Ex. F. Of particular interest, given defendants' refusal to permit her to resume employment, is Dr. Buckle's specific reference, despite the necessary brevity of his note, to one of the functions of Ms. Sensing's takeaway job.

It is clear that while in flare-up she is also impaired in working. In order to survive summary judgment where the major life activity assertedly impaired is working, a plaintiff must "offer some evidence from which a reasonable jury could find that she is significantly restricted in her ability to perform a class of jobs or a broad range of jobs in various classes." See

*Lebron-Torres v. Whitehall Labs.*, 251 F.3d 236, 240 (1st Cir. 2001). Accord 29 C.F.R. § 1630.2(j)(3)(i)(2006). The materials provided show that during flareups[4] of her MS, Ms. Sensing was substantially impaired in the major life activities of walking, grasping, bending, squatting and others. Indeed, during her flare-up in November, 2004, she was extremely impaired in mobility and self care, Ex. B ¶10. These facts would sustain an inference that during flare-ups she was restricted from working in a range or class of jobs, not simply her job with defendants. Accordingly, a jury could sustainably hold that she was also impaired in the major life activity of working. And the episodic nature of this condition means that the reasonable accommodation of allowing time off when she experiences the flareups would suffice to permit her to remain self-supporting.

But apart from her physicians' attestations, the materials relating to this Motion and Opposition offer additional bases adequate to sustain a finding that Ms. Sensing was capable of performing the duties of her position. Ex. B ¶¶10-15. Also, her payment history record Ex. L shows, in its top eight or so lines, that Ms. Sensing worked substantial hours weekly between February and May, 2005: a more than sufficient indication that she was capable of working with or without accommodation. Additionally, of course, defendants' employees give statements testify to her working during this time period and to the accommodations they assert they afforded her, Def Ex. 4, ¶4-6, further confirming that she was capable of, and was in fact, working in her position with accommodation.

Finally, the individual defendant himself attests to his having told Ms. Sensing he would

---

[4] Ms. Sensing is no less entitled to the protections of c. 151B because her MS is episodic, *see, Chanson v. Westinghouse*, 18 MDLR 210 (1996)(Episodic disabling conditions covered by anti-discrimination statute.)

not restore her to employment following a few days' absence in the last half of April, 2005. Ex. K p 114 ll. 22-24; 121 11. 3-5, 17-18. The context of these comments, connected as they are to reports alleging that Ms. Sensing's condition is impairing her ability to perform her duties, Ex. K. P. 144 ll. 8-16, suffice (particularly under the summary judgment standard) to support an inference that Ms. Sensing was denied restoration to employment on account of her disability, multiple sclerosis[5].

2. <u>Defendants failed in their duty, knowing of her disability, to discuss accommodations with Ms. Sensing</u>

Arguably more troubling, the record shows that despite Ms. Sensing's repeated efforts to communicate with defendants concerning remaining employed, at no time did defendants show any sign of willingness to enter the necessary interactive dialogue to determine what accommodations might be necessary to enable her to continue to be self-supporting.[6] See *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 648 n.13 (1st Cir. 2000); *see also Jacques v. Clean-Up Group, Inc.*, 96 F.3d 506, 515 (1st Cir. 1996) ("There may well be situations in which the employer's failure to engage in an informal interactive process would constitute a failure to provide reasonable accommodation that amounts to a violation of the ADA."), cited in *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 108-09 (1st Cir. 2005)"[O]nce the employer becomes aware of the disability of an employee, he is expected to engage in a

---

[5] Defendants' employee/witness indeed refers explicitly to MS symptomatology, Ex. L p. 144 ll. 8-16.

[6] Defendants had already effectively provided accommodations in December 2004 through February, 2005, prior to terminating her, suggesting these accommodations were unobjectionable. Ex. A pp. 28-29. Nevertheless, assuming defendants wished to reconsider this decision, the need for interactive dialogue was arguably even greater.

meaningful dialogue with the employee to find the best means of accommodating that disability."). Cited in *Miller v. Verizon Communs., Inc.*, 474 F. Supp. 2d 187 (2007).

3.  <u>Defendants had already accommodated Ms. Sensing's handicap during early 2005 and she had shown her ability to perform her job duties with that accommodation</u>.

But Ms. Sensing's case is more one of withdrawing and withholding accommodations previously granted (and therefore presumably found at least initially to be reasonable) than failure to provide reasonable accommodation. Ex. A p. 28-29.

Evidence proffered with her Opposition shows that Ms. Sensing had been performing the functions of her position, both with and without accommodation, just prior to defendants' refusal to restore her to employment. After she overcame her November flare-up, defendants accommodated her recuperative state with a light-duty position. This position had her working in a largely sedentary job. As Ms. Sensing's strength returned, she assumed more duties, as her co-workers accommodated her by helping with some heavier meals and tasks requiring more dexterity. Ex. B ¶13-15; Def. Ex. 4,5,6. Fortunately for all concerned, Ms. Sensing has remitting-relapsing MS, which means she needs accommodations which respond to her when she is having a flare-up. No accommodations are needed when she is in remission. Ex. J.

Ms. Sensing's ability to demonstrate that defendants first accommodated, then terminated, her offers yet more evidence supporting a jury finding that discrimination underlay the termination. Accordingly, summary judgment may not enter.

4.  <u>Defendant Kozmits' statements that he was not restoring Ms. Sensing to employment due to liability constitute direct evidence of handicap discrimination and preclude entry of summary judgment.</u>

   Ms. Sensing has also shown direct evidence of defendants' discriminatory termination of her employment in the form of defendant Kozmits' unrebutted statements that health concerns about Ms. Sensing were the reason for not returning her to employment. Ex. A pp. 56 ll. 7-10; 59 ll. 2-9; Ex. L p. 114, ll. 22-24. Beyond these, Ms. Sensing demonstrates by the materials filed herewith that defendant's reason for denying her request to resume employment was based substantially if not entirely on her multiple sclerosis condition. See Ex. A p. 126 ll. 13-17.

  Direct evidence of disability-based animus spares the court the *McDonnell-Douglas* analysis. Its presence here means summary judgment for the defendants may not enter respecting this element of proof.

5. <u>Ms. Sensing's evidence is ample to sustain a jury finding that she did not abandon her job but rather was terminated.</u>

  Ms. Sensing's repeated, earnest, at times tearful efforts to persuade defendants to restore her to her employment amply demonstrates that she did not abandon her job with them but rather that defendants acted adversely against her on account of her condition.

  Ms. Sensing on at least eight distinct, separate occasions[7] made clear her desire, indeed her need[8], to resume her employment in defendants' takeaway operation. First, on April 22, 2005, Ms. Sensing told defendants' scheduler that she was planning to return to work for her next regularly scheduled shift, the following Wednesday, April 27, 2005. Ex. A p. 55 ll 12-13.

---

  [7] These communications are also detailed in Ex. C pp. 5-6.

  [8] Defendants' witnesses refer to Ms. Sensing's comments about working because she needs the money. Not only do the great majority of workers work because like Ms. Sensing they need to support themselves and usually others; but the express purpose of the disability law is to require employers to accommodate disabled workers specifically so they can work, earn money and support themselves. See 42 U.S.C. 12101 (a)(8-9)

Second, on April 23, 2005, Ms. Sensing spoke directly on her cellular telephone with the individual defendant and told him she was prepared and able to work and was planning on reporting for duty. On this occasion the individual defendant's response, that he would not permit her to return because of liability, reduced Ms. Sensing to tears. Ex. A p 56 ll 4-15.

Third, again on April 27, 2005, and following her distressing conversation with the individual defendant, Ms. Sensing again called defendants' scheduler, Ms. Ray, and told her she was capable of working and needed to work. Ex. A p 57 ll 7-20.

Fourth, on April 28, 2005, Ms. Sensing appeared at defendants' place of business in person and met with the individual defendant. During this in-person meeting, which followed shortly after another visit by Ms. Sensing with her physician, Ms. Sensing again described her capability of working and her intent and desire to return to her employment. Additionally, she handed the individual defendant the note from her physician with his determination that she was capable of working in her position. (The individual defendant, not a physician, Ex. K p 9 ll. 6-14, expressed his opinion that Ms. Sensing's doctors did not know "what's going on." Ms. Sensing contradicted him. Ex A. p. 58 ll. 14-24; p. 59 ll. 1-24.)

Fifth, in another conversation on her cellular telephone, this one on April 30, 2005, Ms. Sensing told the individual defendant she was not going on her vacation because of the uncertainties of her employment and that she desired and intended to return to work. In response, the individual defendant told Ms. Sensing he would call her when he heard back from his corporate superiors in Florida, (a promise he never kept.) Ex. G. pp. 123-24.

Nevertheless, on May 3, and again on May 5, 2005, (sixth and seventh efforts), Ms. Sensing telephoned to the individual defendant, repeated her pleas and restated her commitment,

Ex. A p. 65 ll. 7-22.

Eighth, after the individual defendant failed to honor his commitment to Ms. Sensing that he would contact her after consulting his corporate superiors in Florida, Ex A. p. 59 ll. 7-9; p. 64 ll. 17-23, Ex. K pp 123-24, Ms. Sensing sent an electronic mail to him, reiterating her preparedness and capacity to work; and stating when she intended to return to work. Ex. F.

These examples more than suffice to support a jury finding that Ms. Sensing did not abandon her employment but rather was terminated either constructively or directly. Indeed, it is difficult to conceive anything more Ms. Sensing could have done to further manifest her commitment to continuing her employment short of riding in on an elephant with a brass band. Accordingly, Ms. Sensing has carried the opponent's burden under summary judgment law and defendants' motion must be denied.

6. <u>Even were a finding made that ms. Sensing was not disabled, statements in the record demonstrate she was regarded as disabled and was therefore entitled to the same legal protections, and summary judgment may not enter</u>.

The law protects not only the disabled, but those regarded as disabled, G.L. c. 151B §4 ¶17. Here, statements by the defendants and their employee/witnesses make plain that whatever her physical limitations, Ms. Sensing was so regarded. The comments of defendant Kozmits alone, e.g. Ex. K p. 161 ll. 1-7; Ex. A p. 126 ll. 11-17, amply show his belief, despite limited direct observation of her, e.g. Ex. K p. 121 ll. 15-21, that Ms. Sensing was sufficiently disabled to prevent her working in her takeaway job. Not only was this defendant Kozmits' view, but other workers, including Ms. Sensing's immediate supervisor, Ms. Ray, held comparable opinions See Ex. 4,5,6 to Def. Memo.

These statements are contradicted not only by her physicians, Ex. J and their notes Ex. D, E, F; but also by a witness who observed her working, Ex. H. Accordingly, summary judgment may not enter.

C.  GENUINE, MATERIAL FACTUAL ISSUES ABOUND IN THIS CASE, PRECLUDING SUMMARY JUDGMENT IF NOT RENDERING IT FRIVOLOUS

Ms. Sensing's ability to provide sufficient evidence to sustain a jury verdict in her favor on all claims precludes allowance of defendants' motion. But other considerations further buttress this result.

For example, defendants' employee/witness statements fail to establish the time period during which the witnesses observed Ms. Sensing having difficulty with movement and carrying out her job duties. Ex. 4,5,6 to Def. Mem. Ms. Sensing acknowledges that there was a time when she was having difficulty, and when defendants accommodated her, Ex. B ¶10. But her testimony is clear that she recovered from her flare-up and was fully able to resume her duties. Id. ¶¶13-16. This factual disparity requires a fact-finder's resolution and accordingly precludes summary judgment.

Moreover, it is also apparent from the same defendants' witness statements that these employee/witnesses at least in some cases had financial motives for preventing Ms. Sensing's return. Ms. Walforth's statement, for example, plainly shows bias against Ms. Sensing for having taken away shifts that Ms. Walforth could have worked had Ms. Sensing not been employed. And Ms. Balboni's suggestion that Ms. Sensing find new work might also be based on desire not to have to share lucrative takeaway duty shifts with Ms. Sensing. Def. Memo. Ex. 5,6.

-17-

Also, the internal inconsistency between defendants' employee/witnesses stating on one hand that takeaway work was busy and demanding and that Ms. Sensing was slow (albeit without defining the time period of these observations); while on the other that Ms. Sensing was brought in to work when she was not needed, gives rise to additional credibility questions. The court is not permitted to decide credibility issues such as these on the strength of affidavits, *see e.g. Reeves, supra*. Accordingly, these issues must be submitted to a fact finder and summary judgment may not enter.

D. THE EVIDENCE PROVIDED BY MS. SENSING IS AMPLE TO SUPPORT A JURY VERDICT ON HER CLAIM OF DEFAMATION, AND ACCORDINGLY SUMMARY JUDGMENT IS NOT POSSIBLE RESPECTING THIS CLAIM.

Ms. Sensing's evidence includes sufficient facts to sustain a finding that defendants made false statements concerning her, which were derogatory and damaging to her in connection with her employment situation. Accordingly summary judgment may not enter.

Most clearly, defendant Kozmits made the false statement that Ms. Sensing was ineligible for re-hire at Outback because she had abandoned her job. Ex. K p. 145 ll. 3-22; Ex. N. It is clear that Ms. Sensing did not in fact abandon her job, see Section B. 5 *infra;* therefore this statement may sustainably be found to be false by a jury. That a statement of ineligibility for re-hire is damaging and derogatory to an employee is a permissible inference, see *Reeves, supra.* Most often ineligibility for rehiring is the result of theft or other forms of serious workplace misconduct. This statement in many ways is more damaging than a statement that a person was laid off or even terminated. Indeed, the exact import of defendant Kozmits' statements made about Ms. Sensing is an issue for the fact finder, as is their falsity. Accordingly, on the evidence

Ms. Sensing has shown her ability to bring forward, a determination that defendant defamed her could be sustained; and summary judgment may not enter.

E.  **MS. SENSING'S EVIDENCE DEMONSTRATES THAT DEFENDANTS ACTED IN VIOLATION OF THEIR OWN POLICIES AND PROCEDURES AS SET OUT IN THEIR PERSONNEL MANUAL. SUMMARY JUDGMENT MAY THUS NOT ENTER RELATING TO HER CONTRACT CLAIMS AND THE MOTION MUST BE DENIED**.

Defendant Outback has promulgated a series of policies and procedures to govern conduct by its employees covering everything from hand washing to interpersonal relations. Ex. M. These policies proscribe discrimination and require employees to treat one another with respect, Id. p. 4-5. Moreover, despite protestations that these are not contractually binding, defendants make clear in the policies that employees are expected to follow them.

Massachusetts law makes clear that where an employer promulgates a policy governing employee conduct, and expresses its expectation that employees will adhere to that policy, the employer itself will also be required to follow the policy. See, e.g., *O'Brien v. New England Telephone and Telegraph Co.,* Mass.   (199 ). It is plain from Exhibit M that this was the nature of defendant's policy here. Moreover, unlike the plaintiff in *O'Brien*, Ms. Sensing pursued the policy here and sought to exhaust her remedies under it (whether or not she directly consulted it.)

These facts would suffice to sustain a jury verdict in Ms. Sensing's favor respecting the contractual nature of defendant's policies and their having violated them by failing to respect Ms. Sensing and restore her to employment. Accordingly, summary judgment may not enter on this claim.

RESPECTFULLY SUBMITTED

SUZANNA SENSING, PLAINTIFF
BY HER COUNSEL


/s/ Paul H. Merry
Paul H. Merry, Esq.
50 Congress Street Suite 1000
Boston, MA 02109
(617) 720-2400
B.B.O. No. 343580


CERTIFICATE OF SERVICE


I hereby certify that a true copy of the above document was served upon the attorney of record for each other party to this action by means of the United States District Court electronic court filing system on December 3, 2007.


/s/ Paul H. Merry

Paul H. Merry